# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GWENDOLYN HALL, on behalf of** | : | **CIVIL ACTION** |
| **herself and all others similarly** | : | |
| **situated,** | : | |
| *Plaintiffs* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ACCOLADE, INC.** | : | **No. 17-3423** |
| *Defendant* | : | |

## MEMORANDUM

PRATTER, J.                                                                          MARCH 24, 2020

Gwendolyn Hall, on her own behalf and on behalf of others, alleged that Accolade, Inc. underpaid overtime, or failed to pay overtime, to health assistants. On behalf of herself and a putative class and collective, she asserted a Fair Labor Standards Act collective action, and a Pennsylvania Minimum Wage Act class action.

Early in the life of this case, the parties reached a settlement and negotiated an agreement which the Court preliminarily approved in August 2019. Order (Doc. No. 92). The parties now seek certification for purposes of settlement of the hybrid class and collective action, and final approval of the settlement. The parties also seek approval of attorneys' fees and costs, as well as service awards. For the reasons set forth below, and after conducting a hearing on certification and final approval, the Court grants the petition for certification of the class and collective action for purposes of settlement, grants final approval of the settlement, and grants the requests for awards, attorneys' fees, and costs.

### BACKGROUND

Accolade helps employers and insurance companies administer matters called for in health insurance policies. To that end, Accolade employs health assistants who provide customer service,

primarily by fielding calls from customers about issues related to benefits, claims, and the like. Accolade employs health assistants in two relevant states, Pennsylvania and Arizona.

Prior to 2016, Accolade deemed its health assistants to be exempt from the overtime pay mandates of the Fair Labor Standards Act and Pennsylvania Minimum Wage Act.[1] Beginning in 2016, however, Accolade changed its compensation structure and reclassified health assistants as overtime-eligible. That change, and the company's prior treatment of health assistants, precipitated this lawsuit.

Gwendolyn Hall was an Accolade health assistant in Pennsylvania. Ms. Hall filed this lawsuit alleging the commission of violations of the FLSA and PMWA over two separate time periods:

- **From August 1, 2014 – November 26, 2016**, seeking back pay for overtime and alleging that health assistants were *misclassified* as overtime exempt. (The Misclassification Claim).

- **After November 26, 2016**, seeking compensation for *unpaid hours* and alleging that, although health assistants were classified as overtime-eligible starting on November 28, 2016, their overtime pay failed to reflect 15 minutes that the health assistants spent logging into computer systems. (The Unpaid Hours Claim).

The settled PMWA claim is *only* for the misclassification of health assistants. Ms. Hall's PMWA claim is on behalf of Pennsylvania health assistants. The PMWA claim is a federal Rule 23 class action.

The settled FLSA claims include both Misclassification *and* Unpaid Hours Claims. Ms. Hall brings her FLSA claim on behalf of *all* Accolade health assistants—including both

---

[1]      In practice, these statutory schemes are identical to each other.

Pennsylvania-based and Arizona-based health assistants. The FLSA claim is a collective action (requiring health assistants to opt-in to participate in the settlement). The Court conditionally certified the FLSA collective in 2017.

**CERTIFICATION FOR PURPOSES OF SETTLEMENT**

**A. Class Definition, Collective Definition, Settlement Terms, and Response**

    **1. Class Definition**

The settlement class consists of:

> All individuals (other than Cecilia Fitz and Kelly Maines) employed by Defendant Accolade, Inc. in Pennsylvania in the health assistant job title during any week between August 1, 2014 and November 27, 2016.

    **2. Collective Definition**

The collective action consists of:

> 63 individuals (including Plaintiff) who previously joined this action by filing Consent to Join forms with the Court.[2]

    **3. Notice and Response**

The preliminary settlement approval appointed Strategic Claims Services, Inc. ("SSI") to administer the mailing of Court-approved notices. SSI mailed by way of first class mail (and re-mailed where necessary) individualized versions of the notice form to the class/collective members per Court-approved procedures. Class members had until October 25, 2019 to object or seek exclusion from the settlement. Moreover, in the notice form, Winebrake & Santillo, LLC and Hardwick Benfer, LLC provided their law firm addresses and phone numbers, notifying the recipient of the notice that should that person have any questions about the lawsuit or settlement,

---

[2]     Forty-six (46) of these individuals are covered by the proposed Rule 23 class.

they could call these firms, free of charge and in confidence. No individuals objected, and only two individuals excluded themselves from the putative class.[3]

Sixty-two (62) Plaintiffs opted into the FLSA collective action; thus, including Ms. Hall, there are sixty-three (63) members of the FLSA collective action. Forty-eight (48) of these sixty-three (63) Plaintiffs were employed in Pennsylvania. These are the "Pennsylvania Opt-Ins." The remaining fifteen (15) were employed in Arizona, and these are the "Arizona Opt-Ins."[4]

Plaintiff's PMWA claim is pursued on behalf of a putative class of three hundred and one (301) Pennsylvanian health assistants. However, forty-six (46) of these individuals also joined the FLSA collective.[5] The remaining two hundred and fifty-five (255) individuals who worked for Accolade in Pennsylvania and did not opt into the FLSA collective action, but who nonetheless worked from August 1, 2014 to November 26, 2016 and were misclassified as over-time exempt are referred to as the "Non-Opt-Ins."[6]

The following is a summary of the three hundred and eighteen (318) persons covered by this settlement agreement.

---

[3]  These two putative class opt-outs are Cecilia Fitz and Kelly Maines. Their anticipated settlement payments total $4,173.95, and this number has been deducted from the pre-notice settlement fund of $1,100,000 in accordance with the settlement agreement. Moreover, the executed settlement agreement had contemplated 323 class/collective members. This number is reduced to 318 due to the stated opt-outs and three other individuals being double-counted on the class list (Amira Edwards, Erin Martin/Lutz, and Kali Reierson).

[4]  While the settlement agreement designated Whitney Tucker as an Arizona Opt-In, during the subsequent notice period, it was discovered that Ms. Tucker is actually a Pennsylvania Opt-In. Thus, her share of the settlement proceeds has been increased from $4,345.38 to $5,380.44. The increase does not reduce the anticipated settlement payments of other class/collective members.

[5]  Two Pennsylvania Opt-Ins worked exclusively during the Post-November 26, 2016 Period, and are not covered by the Misclassification Claim.

[6]  Plaintiff does not seek class certification of a Rule 23 class covering the Unpaid Hours Claim.

| Category of Health Assistant | Type of Claim |
|---|---|
| 255 Non-Opt-In Class Members | Misclassification Claim |
| 48 Pennsylvania Opt-Ins | 46 individuals - Misclassification Claim<br><br>2 individuals - Unpaid Hours Claim |
| 15 Arizona Opt-Ins | Misclassification Claim and Unpaid Hours Claim |

### 4. Settlement Terms

The settlement created a non-reversionary settlement fund of $1,095,826.05,[7] and upon final approval of the settlement, this fund will be distributed as follows:

- $720,826.05 to be paid to the 318 putative class/collective members;

- $12,000 in service awards to be shared by Plaintiff and two other individuals;

- $363,000 to be paid to Winebrake & Santillo, LLC ("W&S") and Harwick Benfer ("HB") (together "Class Counsel") for fees and costs.

On or before seven (7) days after the final approval date of the settlement agreement, Accolade will transfer to the Administrator a payment of $1,100,000 less exclusions. On or before twenty-one (21) calendar days after the final approval date, the Administrator will issue a payroll check to each settlement participant by mail (tax deductions and other withholdings made). All settlement checks will bear an expiration date falling 150 calendar days after the final approval date. If the funds associated with checks are not cashed by the aforementioned expiration date, and they exceed 5% of the total payments made, then the Administrator will redistribute the funds on a *pro rata* basis to the settlement participants. If the funds do not exceed 5% of the total payments, such funds will be donated to the Pennsylvania IOLTA Board. Under the agreement,

---

[7]      This value excludes the value of the two opt-outs.

any disapproved attorneys' fees, litigation expenses, or service awards will also enhance the settlement payments to the three hundred and eighteen (318) health assistants.

Each category of Plaintiff is paid differently, on a weekly basis, depending on the time period worked, where the health assistant worked, and whether he/she opted into the FLSA collective. The payment of each group is as follows:

    a.  <u>Payments for Weeks Worked by Arizona Opt-Ins and Pennsylvania Opt-Ins During the Post-November 26, 2016 Period</u>:

This category of payments pertains to the Unpaid Hours Claim, which alleges that health assistants did not receive payroll credit for around 15 minutes purportedly spent logging into various computer systems and programs at the beginning of each shift, starting from November 28, 2016 and ending on December 29, 2018. Because Plaintiff does not seek Rule 23 certification of the Unpaid Hours Claim (and seeks class certification only for the Misclassification Claim), only Arizona Opt-Ins and Pennsylvania Opt-Ins are eligible to recover under this category. These opt-ins will be paid $30 for each week worked.[8]

    b.  <u>Payments for Weeks Worked by Arizona Opt-Ins During the August 1, 2014 to November 26, 2016 Period</u>:

The Misclassification Claim covers this time period. The recovery period spans from August 1, 2014 until three years before the individual's opt-in date. Each of the 15 Arizona Opt-Ins worked during this period and can assert this claim. The FLSA is the sole source of their claim.

---

[8]    Class Counsel supports this result because Accolade disputes the time spent by the health assistants logging into and out of the computer system as compensable time. Even if the time was determined to be compensable, it is Defendant's position that such time was already compensated. Thus, absent settlement, Class Counsel represents there is at least a 50% chance that Accolade would win on this issue. Moreover, during the Post-November 2016 Period, the health assistants' average hourly pay rate was approximately $20, which allows for an overtime pay rate of $30. Thus, the $30/week payout approximates the 1.25 hours sought via the Unpaid Hours Claim.

This group of Opt-Ins will receive $18.86 for every week worked during this specific time period.[9]

    c. Payments for Weeks Worked by Non-Opt-In Class Members During the August 1, 2014 and November 26, 2016 Period:

Two hundred and fifty-five (255) health assistants worked in Pennsylvania during this period. Under the settlement agreement, these individuals could recover $28.28 for every week worked.[10]

    d. Payments for Weeks Worked by Pennsylvania Opt-Ins During the August 1, 2014 to November 26, 2016 Period:

Under the settlement agreement, the forty-six (46) Pennsylvania Opt-Ins who worked during this time period would stand to recover $37.74 for each week falling within a three-year FLSA limitations period, and $28.28 for any other week within the same time period. The higher recovery in contrast to the Arizona Opt-Ins and the Non-Opt-Ins is due to the comparatively stronger litigation position. For instance, as compared to the putative class members, the recovery by these individuals is not dependent on a favorable class certification ruling.

The settlement agreement also contemplates a release by all putative class and collective members in favor of Accolade, from all claims asserted in or related to this lawsuit, including all claims seeking unpaid overtime wages under the FLSA, the Pennsylvania Minimum Wage Act,

---

[9]     Using a "half-time" methodology, which Class Counsel represents is the methodology used when, as here, the employees' salaries are not tied to a fixed number of work hours, the $18.86 weekly payout approximates roughly over two overtime hours per week, which Counsel contends is a positive result given the risks of litigation involved, including that Accolade could prevail on the issue of whether these Opt-Ins were properly classified, the possibility that the Court would apply a two-year statute of limitations on the recovery period (whereas the settlement allows for recovery for a three-year period), and that data produced during discovery suggested the health assistants did not work substantial overtime hours.

[10]     Class Counsel represents this to be fair, despite that these putative class members would stand to recover more per week than the Arizona Opt-Ins who joined the FLSA collective. This is due to (1) the PMWA providing for a strict three-year limitations period, which is distinct from the FLSA, and (2) the Pennsylvania Supreme Court having recently held that under the PMWA, salaried employees' overtime pay is calculated pursuant to a "time and a half" methodology as opposed to a "half-time" formula under the FLSA. *See Chevalier v. General Nutrition Centers, Inc.*, 220 A.3d 1038 (Pa. 2019). For these reasons, Interim Class Counsel believes it fair for the 255 class members to receive 50% more per week than the Arizona Opt-Ins.

the Pennsylvania Wage Payment and Collection Law, the Arizona Wage Law, and any other federal, state, or local statute, regulation, ordinance, or common law theory seeking unpaid wages or any associated penalties, liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, or equitable relief arising between August 1, 2014 and the date in which the Court enters an order granting final approval of the settlement. The parties represent the release does not cover other non-wage claims that Ms. Hall or other covered health assistants may have against Accolade.

## B. Class Certification

### 1. Rule 23 Factors

"A provisionally certified settlement class must still receive final district court approval in accordance with the Federal Rules of Civil Procedure." *In re Gen. Motors Corp. Pick-Up TruckFuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 786 (3d Cir. 1995). To that end, the reviewing court must "undertake a rigorous analysis of the evidence to determine if the standard is met." *Carrera v. Bayer Corp.,* 727 F.3d 300, 306 (3d Cir. 2013) (quoting *Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 593 (3d Cir. 2012)). The proposed settlement class must satisfy the requirements of Fed. R. Civ. P. 23(a): numerosity, commonality, typicality, and adequacy of representation. Additionally, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Under Fed. R. Civ. P. 23(b)(3), a class action may be maintained if (1) common questions of law or fact predominate questions affecting only individuals and (2) a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." In making this determination, courts should consider: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or

undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).

### 2.  Discussion of 23(a) Factors

While there is "[n]o minimum number of plaintiffs . . . required to maintain a suit as a class action, . . . generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  *Stewart v. Abraham*, 275 F.3d 220, 227–28 (3d Cir. 2001).  The proposed PMWA class includes three hundred and one (301) members (46 Opt-Ins and 255 Non-Opt-Ins).  The numerosity requirement is met.

The commonality bar "is not a high one," *Rodriguez v. National City Bank*, 726 F.3d 372, 382 (3d Cir. 2013), and "[b]ecause the requirement may be satisfied by a single common issue, it is easily met[.]"  *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994) (citation omitted).  Here, the core disputed issue is whether Accolade (mis)classified every single class member as overtime-exempt starting on August 1, 2014 and ending on November 26, 2016.  This creates a common legal issue: whether the exemption was proper under the PMWA.  The commonality prong is met.

 "The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented."  *Id.* at 57.  Courts look to whether "the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.  . . . [C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement."  *Id.* at 57–58 (quotations and citations omitted).

Here, the circumstances, underlying legal questions, and unlawful legal conduct are the same for all class members:  all turn on whether the health assistants were misclassified as exempt

from overtime pay.  Ms. Hall has the same interests as the members of the putative class, namely to recover unpaid wages from Accolade based on alleged misclassification as overtime-exempt.

The final Rule 23(a) factor focuses on adequacy – whether "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4). This requirement has two components.  The rule "tests the qualifications of class counsel and the class representatives.  It also aims to root out conflicts of interest within the class to ensure that all class members are fairly and adequately represented in negotiations."  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.2d 410, 428 (3d Cir. 2016).

In this case, Class Counsel explains having spent extensive time and resources in representing the class and engaging in arms-length dealing.  Further, as evidenced by the typicality and commonality considerations discussed above, the interests of the named Plaintiff representative and the class members appear aligned.  Finally, Counsel is experienced in this type of litigation, and there are no apparent conflicts of interest.  Counsel and Ms. Hall have adequately represented the interests of the class.  *See In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) ("emphasiz[ing] the special need to assure that class counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant.")

### 3.  Rule 23(b) Factors & Discussion

The putative class also meets the predominance requirement.

> "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.  When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citations and quotations omitted).

As with typicality and commonality, one issue is central to all class members:  whether Accolade misclassified health assistants as overtime exempt. "Predominance is normally satisfied when plaintiffs have alleged a common course of conduct on the part of the defendant."  *In re Janney Montgomery Scott LLC Fin. Consultant Litig.*, No. 06-3202, 2009 WL 2137224, at *5 (E.D. Pa. July 16, 2009) (finding predominance in overtime lawsuit challenging common classifications of employees as overtime-exempt under white-collar exemptions).  Consequently, the predominance requirement is met.

With respect to the "superiority inquiry," the Court looks at several factors:

> "'(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.'"

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 315 & n.56 (3d Cir. 1998) (quoting Fed. R. Civ. P. 23(b)(3)).

All of these factors appear to be satisfied.  There are not any evident interests counseling in favor of individual control.  The Court is unaware of any other lawsuits that have been filed against Accolade with the same allegations.  All of the class members worked in Pennsylvania, so this forum is appropriate, and settlement mitigates any difficulties in the management of the action.[11]

---

[11]    Under Rule 23(g), the two law firms representing Ms. Hall, Winebrake & Santillo, LLC and Hardwick Benfer, LLC, were appointed as Interim Class Counsel.  These firms now seek to be appointed as class counsel for purposes of certification.  In consideration of the factors set forth in Rule 23(g), and there being no opposition, the Court appoints both law firms as class counsel for the purposes of class certification. *See* Fed. R. Civ. P. 23(g).

Having found all of the relevant Rule 23(a) and (b) factors met, the Court certifies the class for purposes of settlement approval.

## C.   Collective Certification

When analyzing the certification of a collective action, "the standard to be applied on final certification is whether the proposed collective plaintiffs are 'similarly situated.'" *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536 (3d Cir. 2012) (citing 29 U.S.C. § 216(b)). Factors which the court should consider include, but are not limited to: "whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment." *Id*.

Final certification of the Collective is unopposed. As to the factors referenced in *Zavala*, all members of the Collective worked as health assistants employed by Accolade. Additionally, all members of the Collective advance the same claims – that they were either misclassified as overtime-exempt or underpaid for overtime.  Finally, because all Collective members were health assistants, they had sufficiently similar salaries and circumstances of employment. Moreover, courts have observed that certification under the FLSA is less stringent than certification of a Rule 23 class.  *See Goldman v. RadioShack Corp.*, No. 03-32, 2006 U.S. Dist. LEXIS 2433, *22-25 (E.D. Pa. Jan. 23, 2006).  Consequently, the Court certifies the FLSA collective action.

### NOTICE

Federal Rule of Civil Procedure 23(c)(2)(B) further requires that the Court "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  "Due process requires that class members receive adequate notice because they are bound by the judgment entered in the action." *In re Janney Montgomery Scott LLC Financial Consultant Litig.*, 2009 WL 2137224, at *7.

This notice is to be given to all potential members of a Rule 23(b)(3) class. Specifically, the Rule provides that such notice

> must, in clear, concise and plain language, state: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues or defenses; (iv) the class member's right to enter an appearance by an attorney; (v) the class member's right to be excluded from the class; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of settlement on class members.

Fed. R. Civ. P. 23(c)(2)(B). Second, Rule 23(e) requires all members of the class be notified of the terms of any proposed settlement. Fed. R. Civ. P. 23(e). This "notice is designed to summarize the litigation and the settlement" and "'to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation.' " *In re Prudential Ins.,* 148 F.3d at 327.

As noted above, after a hearing in which the Court outlined its concerns related to the notices, the Court's August 22, 2019 Order granting preliminary approval of the settlement also approved of the class notice forms and authorized distribution. The notices provided the details of the litigation and the proposed settlement. In its preliminary approval determination, the Court further noted that "[t]he settlement provides for individualized notices to each class member, and it also provides that any class member who has not already opted-in to the FLSA collective *does not affirmatively need to take any action* to receive payment. . . . The notices also allow for settlement participants to raise objections to, and opt-out from, the settlement if they so choose." Memorandum (Doc. No. 91), p. 8. Furthermore, prior to mailing the notices, addresses were verified and updated. Based on these considerations, Plaintiff has provided sufficient evidence of compliance with the notice provisions of Rule 23.

## A. Class Action

Rule 23(e) provides that a class action settlement or compromise requires Court approval. The Court may only approve a settlement that would bind class members upon a finding that the settlement is "fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2). The Court should consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.[12]

---

[12] As set forth previously in the Court's preliminary approval of this proposed settlement, in *Girsh v. Jepson*, the Third Circuit Court of Appeals articulated nine factors for district courts to consider in deciding whether a class action settlement is fair and reasonable:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

## 1. Adequacy of Representation and Arm's Length Negotiation

Class Counsel and Ms. Hall have adequately represented the class throughout the case. Prior to reaching settlement, counsel also took depositions, engaged in written discovery, reviewed voluminous production, built a damages model, and interviewed fifty-five (55) class members. Counsel also represents they are well-versed in class litigation. No one has challenged that representation, and the Court's observations of counsel's endeavors also support that representation.

Moreover, the parties here agreed to settle the case after multiple conferences with a magistrate judge. "[T]he participation of an independent mediator in settlement negotiations virtually [e]nsures that the negotiations were conducted at arm's length and without collusion between the parties." *Bellum v. Law Offices of Frederic I. Weinberg & Assocs., P.C.*, No. 15-2460, 2016 WL 4766079, at *6 (E.D. Pa. Sept. 13, 2016) (citation and quotation omitted). These factors weigh in favor of final approval of the settlement agreement.

## 2. Adequacy of Relief

### a. Does the Relief Account for the Costs, Risks, and Delay of Trial

According to the Advisory Committee Notes concerning Federal Rule of Civil Procedure 23, this factor balances the "relief that the settlement is expected to provide to class members" against "the cost and risk involved in pursuing a litigated outcome." Fed. R. Civ. P. 23 Advisory Committee Notes (Dec. 1, 2018). The Notes also state that this analysis "cannot be done with

---

521 F.2d 153, 157 (3d Cir. 1975) (alterations omitted) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). The *Girsh* factors predate the recent revisions to Rule 23, which now explicitly identifies the factors that courts should apply in scrutinizing proposed class settlements, and the earlier discussion in *Girsh* substantially overlaps with the factors now identified in Rule 23.

arithmetic accuracy, but it can provide a benchmark for comparison with the settlement figure." *Id.*

Class Counsel asserts that here, absent settlement, the parties would likely have incurred significant additional costs, including motion practice regarding (1) certifying the FLSA collective action, (2) certifying the Rule 23 class action, and (3) summary judgment. Class Counsel also states that if the case had proceeded to trial as a class or collective action, the Court would be presented with extensive briefing regarding the scope and propriety of representative evidence and testimony. Furthermore, although Ms. Hall already constructed a damages model without using an expert witness, she likely would have hired an additional damages expert for presentation purposes. Finally, Counsel contends that the parties faced significant litigation risks, including that the overtime hours actually worked by many class members individually could or would be found to be modest.

b.    Whether the Settlement Provides for an Effective Proposed
        Method of Distributing Relief

Under this factor, the Court "scrutinize[s] the method of [notice] processing" and "should be alert to whether the . . . process is unduly demanding." Fed. R. Civ. P. 23 Advisory Committee Notes (Dec. 1, 2018). The settlement agreement does not require that any class or collective members file claims, and it also provides that unless PMWA class members explicitly ask to be excluded, they will be paid so long as they can be located by the Settlement Administrator. Furthermore, the notice process to date confirms that the Administrator has up-to-date addresses for the class members and has not experienced significant difficulties in contacting class members.

c.    The Terms for Proposed Attorneys' Fees

The proposed attorneys' fees are $341,089.45 out of a total settlement amount of $1,095,826.05. This equates to about a 31% attorneys' fees award. Class Counsel argues that this

factor supports approval because the settlement is not contingent upon the Court's approval of counsel fees. Moreover, any disapproved fees will be distributed to the class members and any approved fees will be paid at the same time as the payments to class members. Finally, the attorneys note that this Court has previously commented that "the average attorney's fees percentage in [surveyed class action] cases was 31.71% and that the median fee award was 33.3%." *Williams v. Aramark Sports, LLC*, No. 10-1044, 2011 WL 4018205, at *10 (E.D. Pa. Sept. 9, 2011). Collectively, the considerations under this factor weigh in favor of approving the settlement agreement.

### 3. Whether the Proposal Treats Class Members Equitably Relative to Each Other

The FLSA collective action and the PMWA class action pay out at slightly different rates based on the differences between the Unpaid Hours Claim and the Misclassification Claim, as well as distinctions between Arizona Opt-Ins, Non-Opt-In Class Members, and Pennsylvania Opt-Ins. These differences are based on the relative strength of the overtime claims and each settlement participant's litigation posture. Class Counsel has provided adequate support for the considerations behind these distinctions, which are driven by the risks inherent in each claim and the relative strength of each claim, which were discussed previously. This factor weighs in favor of final approval of the settlement agreement.

Having found all of the Rule 23(e) factors met, the Court grants final approval of the settlement finding that it is fair, reasonable, and adequate.

### B. FLSA Collective

As Class Counsel acknowledges, Rule 23 governs class action settlements, *not* FLSA collective actions. When evaluating a collective action settlement of FLSA claims, district courts must determine whether the settlement is a "fair and reasonable resolution of a bona fide

dispute." *Adams v. Bayview Asset Mgmt., LLC*, 11 F. Supp. 3d 474, 476 (E.D. Pa. 2014) (citing *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1355 (11th Cir. 1982)). *See also Cuttic v. Crozer-Chester Med. Ctr.*, 868 F. Supp. 2d 464, 466 (E.D. Pa. 2012) ("When parties present to the district court a proposed settlement, the district court may enter a stipulated judgment if it determines that the compromise reached is a fair and reasonable resolution of a bona fide dispute over FLSA provisions rather than a mere waiver of statutory rights brought about by an employer's overreaching.") (citation and quotation omitted).

Here, the settlement clearly reflects a compromise over issues that are actually in dispute. The members of the Collective challenge Accolade's failure to pay them overtime, and Accolade vigorously contended throughout the litigation that the health assistants were properly classified as overtime-exempt prior to November 28, 2016, and that during all relevant times, the health assistants did not work significant overtime hours. Moreover, while the Third Circuit Court of Appeals has not provided guidance on the criteria that should be applied in evaluating the fairness of FLSA settlements, Class Counsel contends that the proposed settlement agreement should be approved under the same approval process required under Rule 23 for proposed class settlements. Indeed, Rule 23 applies an extra layer of stringency to the approval of FLSA collective actions.

Consequently, for the reasons the Court approved of the Rule 23 class settlement, the FLSA collective action is also deemed fair and reasonable. *See, e.g.*, *Aramark Sports, LLC*, 2011 WL 4018205, at *9 (approving FLSA collective action "[f]or essentially the same reasons the Court found that the Rule 23 requirements were met").

### C. Requested Enhancement Awards

Ms. Hall seeks $10,000 in a service award for herself, and two separate $1,000 service awards for Opt-Ins JaCarla Royall and Denise Belcher.

"Payment awards to class representatives lie within the discretion of the trial court and may be provided as a reward for the benefit visited on the class." *In re Plastic Tableware Antitrust Litig.*, No. 94-3564, 1995 WL 723175, at *2 (E.D. Pa. Dec. 4, 1995). Courts may consider the following factors in determining whether incentive awards are appropriate: the risk to the plaintiff in commencing litigation, both financially and otherwise; the notoriety and/or personal difficulties encountered by the representative plaintiff; the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial; the duration of the litigation; and the plaintiff's personal benefit (or lack thereof) purely in his capacity as a member of the class. *Id.*

Class Counsel contends the awards are justified because (1) service awards are commonplace in cases like this one, (2) courts have approved of awards of up to $10,000 in wage and hour class/collective actions, (3) Ms. Hall was especially diligent in pursuing the collective litigation (even attending the settlement conferences with Magistrate Judge Rice), and (4) Ms. Royall and Ms. Belcher should be compensated for their time and effort associated with participation in their depositions. Moreover, Class Counsel argues that no class/collective members have objected to the proposed service awards even though they were expressly disclosed in all notice forms.

Due to the efforts of these individual Plaintiffs during the course of the litigation, the Court will award the service awards requested. No class/collective members have objected. *See In re Janney Montgomery Scott LLC Financial Consultant Litig.*, 2009 WL 2137224, at *12 (granting requested award of $20,000 per named plaintiff because there were no objections to the awards and each plaintiff was instrumental in prosecuting the case, including his/her involvement in

discovery, assisting the attorneys in understanding the case, and risking potential retaliation for filing the lawsuit).

### D. Attorneys' Fees & Costs

Ms. Hall requests attorneys' fees and costs for a total of $363,000. Because litigation and settlement administration expenses total approximately $21,910.55, the settlement results in an attorneys' fee payment of $341,089.45, which approximately equates to 31.1% of the entire settlement fund.

Courts in the Third Circuit generally use either the percentage-of-recovery or lodestar method for determining attorneys' fees. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005); *In re Prudential*, 148 F.3d at 333. "The percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" *In re Prudential Ins.*, 148 F.3d at 333 (quoting *In re General Motors.*, 55 F.3d at 821). "The lodestar method is more commonly applied in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation." *Id.* (quoting *In re General Motors*, 55 F.3d at 821). The lodestar method "may also be applied in cases where the nature of the recovery does not allow the determination of the settlement's value necessary for application of the percentage-of-recovery method." *Id.* at 332. Accordingly, the Court applies the percentage-of-recovery method in awarding attorneys' fees here.

### 1. Percentage-of-Recovery

"Courts have allowed attorney compensation ranging from 19 to 45% of the settlement fund created, and one Circuit panel has concluded that the appropriate benchmark for fee awards is 25%." *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 533 (E.D. Pa. 1990)

(internal citations omitted). Courts apply the *Gunter* factors to determine if the fee produced is reasonable. *See Gunter v. Ridgweood Energy Corp.*, 223 F.3d 190, 195 (3d Cir. 2000). Those factors include, "(1) the amount of the value created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiff's counsel; (7) the awards in similar cases[.]" *In re Diet Drugs Product Liability Litigation*, 582 F.3d 524, 541 (3d Cir. 2009). Courts also consider additional factors, including "the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups; [ ] the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and [ ] any innovative terms of settlement." *Id.* (citing *In re Prudential*, 148 F.3d at 338-40).

- Size of the Fund & Number of Persons Benefitted: In this case, Class Counsel is requesting roughly a 31% fee out of a total settlement fund of $1,095,826.05. After fees, expenses, and the service awards, 318 class/collective members will benefit from $720,826.05 in the fund. This factor favors approval.

- Objections: This factor favors approval because although two individuals sought to be excluded from the collective, no class member objected. The requested fee was explicitly disclosed in the notice form.

- Skill and Efficiency of Attorneys: As discussed, the attorneys negotiating this settlement have substantial experience in class action litigation, including employment litigation, and demonstrated that skill to the Court's satisfaction.

- <u>Complexity and Duration of the Litigation:</u> According to the attorneys, this factor supports approval because, in the absence of settlement, the litigation would entail a series of complex litigation events, including, but not limited to, the parties' briefing around certification, summary judgment motions, expert damages reports, expert discovery, and complex pretrial procedures.

- <u>Risk of Non-Payment:</u> Class Counsel invested considerable resources into this case with no guarantee that they would recover those costs given that they were retained on a contingency fee basis.

- <u>Time Devoted to the Case</u>: Class Counsel has spent more than 800 hours on this litigation.

- <u>Awards in Similar Cases:</u> Many courts have approved of similar awards, and Class Counsel points to courts in this jurisdiction that have approved of fees valued between 26% to 40% of the fund.

- <u>Value of Benefits Attributable to the Efforts of Class Counsel Relative to the Efforts of Other Groups:</u> This factor favors approval because the Court is unaware of other groups that have brought parallel actions.

- <u>Percentage Fee if the Fee was Negotiated via a Private Contingent Fee Arrangement:</u> Contingency fees generally range between 30% to 40%. Thus, this factor favors approval, given that the proposed percentage of the fee in this case is at the low end of this range.

- <u>Innovation in Terms of Settlement</u>: This factor is neutral because the settlement does not involve any very novel or creative characteristics.

Thus, under the percentage-of-recovery method, on balance, the factors favor approval of the requested attorneys' fees.

### 2.     Lodestar Crosscheck

While not required, the lodestar approach may be used to cross-check the award of fees under the percentage-of-recovery method.  "The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 305.  "A court determines a reasonable hourly rate by assessing the experience and skill of the prevailing party's attorneys and by looking at the market rates in the relevant community for lawyers of reasonably comparable skill, experience and reputation."  *Perry v. FleetBoston Financial Corp.*, 229 F.R.D. 105, 119 (E.D. Pa. 2005).  This Court has previously approved of the use of the fee schedule rates developed by Community Legal Services as reasonable hourly rates. *Jimenez v. Best Behavioral Healthcare, Inc. et al.*, No. 18-1003, 2019 WL 6528766, at *4 (E.D. Pa. Dec. 3, 2019).

In support of the request for fees, Class Counsel has submitted affidavits detailing the skill of the attorneys in wage and hour cases, the hours worked, and the hourly rates used to calculate the fees request.   Class Counsel expended more than 800 total hours on this litigation,  including investigating claims, formulating case strategy, drafting complaints, participating in discovery, engaging in settlement discussions, negotiating and drafting the agreement, preparing and overseeing dissemination of class notice, and communicating with class members.

Class Counsels' market hourly rates, in reliance on the CLS rate schedule, are as follows:

- Winebrake & Santillo, LLC: ranging between $360 to $670 per hour

- Hardwick Benfer, LLC: $160-420 per hour

The hourly breakdown for each firm (by attorney) is presented in the following tables.

| Winebrake & Santillo, LLC | | | | |
|---|---|---|---|---|
| **Name** | **Title & Experience** | **Hourly Rate** | **Time Spent** | **Total Billed** |
| Peter Winebrake | Partner (1991 law graduate) | $670 | 182.4 | $114,302.00 |
| R. Andrew Santillo | Partner (2004 law graduate) | $450 | 217.5 | $96,480.00 |
| Mark J. Gottesfeld | Partner (2009 law graduate) | $360 | 15.0 | $5,400.00 |
| | | **Total** | **414.90** | **$225,483.00** |

| Hardwick Benfer, LLC | | | | |
|---|---|---|---|---|
| **Name** | **Title** | **Hourly Rate** | **Time Spent** | **Total Billed** |
| Tiffanie Benfer | Partner (2003 law graduate) | $420 | 61.8 | $25,956.00 |
| Jill Walsh | Associate (2012 law graduate) | $360 | 346.5 | $124,740.00 |
| Kimberly Hagerich | Paralegal II | $200 | 25.0 | $5,000.00 |
| Erica Bixel | Paralegal I | $160 | 22.30 | $3,568.00 |
| | | **Total** | **455.60** | **$159.264.00** |

As a result, Class Counsels' lodestar totals $376,179.00, which exceeds the $341,089.45 fee requested. Given that the lodestar yields a higher value than the fees currently sought, the rates the attorneys are requesting fall within the CLS ranges, Accolade is not objecting to the fees, and the work apportioned supported by the affidavits appears reasonable,[13] the Court also finds that the lodestar cross-check evinces the reasonableness of the fees sought.

### 3. Costs

Finally, as noted previously, Class Counsel is requesting $21,910.55 in costs. The largest of the expenses is $18,000 in settlement administration costs. At oral argument on the consent motion, Interim Class Counsel represented that $18,000 would be the maximum amount of

---

[13]    At oral argument on certification and final approval, the parties represented that the two law firms representing Ms. Hall coordinated their representative efforts and, to the extent possible, did not duplicate efforts.

settlement administration costs sought or paid. Ms. Hall's request for costs also include filing fees, photocopying costs, transcript costs and the like. Accolade does not oppose the request.

"Counsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case." *In re Cendant Corp.*, 232 F. Supp. 2d 327, 343 (D.N.J. 2002). Upon review of the affidavits demonstrating support for the costs requested, the Court grants the request for costs in the amount of $21,910.55. *See In re Janney Montgomery Scott LLC Financial Consultant Litig.*, 2009 WL 2137224, at *17 ("Items such as photocopying, telephone and fax charges, express mail charges, expert witness fees, and computer-assisted research are necessary for the prosecution of a large class action lawsuit.")

CONCLUSION

For the aforementioned reasons, the Court certifies the class and collective action for purposes of settlement, grants final approval of the settlement, and awards attorneys fees, costs, and service awards. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE